(No. 1801— ▮▮▮▮▮▮▮▮▮▮
(No. 1802— ▮▮▮▮▮▮▮▮▮▮

PETER C. PACHESA, ADMINISTRATOR OF THE ESTATES OF EUGENE PACHESA AND PETER E. PACHESA, Deceased, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed January 11, 1933.*

HOMER D. McLAREN, for claimant.

FRANK M. RAMEY, for claimant.

OSCAR E. CARLSTROM, Attorney General and CARL DIETZ, Assistant Attorney General, for respondent.

Mr. Justice Roe delivered the opinion of the court:

The claimant, Peter C. Pachesa, Administrator of the Estates of Eugene Pachesa, No. 1801 and Peter E. Pachesa, No. 1802, deceased, claims damages for the death of his two sons, Eugene and Peter E. Pachesa.

It appears that on July 6, 1931, these sons were injured in a collision with a water tank trailer belonging to the State of Illinois and death resulted the same day. With Eugene, aged fifteen years, at the time of the accident were two other boys, a brother Peter E. Pachesa, aged eighteen years, and Edward J. Norkus, also eighteen years of age, who were injured and died soon thereafter on the same day.

Peter C. Pachesa, of Taylor Springs, Illinois, father of two of the boys, was engaged in the business of selling meat and he had sent these boys to East St. Louis in a Dodge Panel Truck for a load of meat. They were returning with the meat and as they neared the town of Hillsboro on State Bond Issue Route No. 16, the collision occurred about nine o'clock a. m. The Dodge Truck, driven by said Peter E. Pachesa, a licensed chauffeur, had just rounded a curve near the foot of a long winding hill. This hill is paved with brick and has about seven and one-half per cent grade. A short way up the hill, Route No. 16, known as Springfield Road, is intersected by Oak Street, which is at or near the western limits of Hillsboro. At the point of the accident the roadway is built on a high embankment and on both sides of the road there is a regulation highway fence.

The water tank trailer, attached to a Ford truck, designated at No. 811-L, belonging to the respondent and being used by the Division of Highways in pavement and jack operations, became detached and swung to the left or south side of the road in the path of the oncoming Dodge truck. The driver of the State Ford truck, Galen Dougherty, states that when he noticed that the trailer was loose, he looked ahead and saw the Dodge truck rounding a curve and approaching the hill traveling east toward him about two hundred yards away. The record discloses that finding himself in this dilemma, he was required to make a quick decision. He either had to turn his truck to the left side of the road and try to stop the onrushing trailer or he had to speed up his truck in order to allow the Dodge truck to swerve to the

north behind his truck and get out of the path of the loaded tank trailer. The State truck driver chose the latter course of action and sped down the hill driving with one hand and waving the other hand and shouting at the boys in the Dodge truck to warn them of the impending danger. In times of crisis, one must sometimes act with lightning rapidity and this is what Galen Dougherty seemed to do in his endeavor to prevent the terrible accident which followed. He testified that his truck was at least fifty feet ahead of the trailer when he passed the Dodge truck and had the boys quickly turned to the north side of the road between his truck and the trailer, they might have been saved. However, the boys were evidently put to a quick decision also at this critical time and the driver of the Dodge truck elected to try to make a turn to the right into Oak Street. However, before the turn could be executed, the trailer was upon them and a terrific smashup resulted.

It seems that both drivers tried to avoid the accident and each made a quick decision and exhibited the best judgment at his command. To say that the collision could have been prevented, had either or both acted differently, is problematical at best. However, the result was most disastrous and distressful. For the deaths of the three boys, damages in the amount of Fifteen Thousand Dollars each is claimed.

As a matter of convenience in the presentation of the three claims counsel hereto agreed to consolidate the evidence and briefs so that facts and arguments arising from the same accident could be considered together.

Before we pass to a consideration of the cases and arguments submitted, there are some important facts to be kept in mind.

The water trailer was attached to the Ford truck by a four-inch U-shaped iron clevis with an iron pin nine inches long passing through the clevis and an iron eye in the tongue of the trailer. A few days before the accident this clevis or coupling had been made new and the iron pin had been lengthened because the State employees had decided after using the truck and trailer several days that the coupling between the Ford truck and the attached water tank trailer was insufficient, could not be trusted and was liable to break. (Abstract, page 16.) Therefore, the foreman of the mud jack operations for the State Division of Highways at this point,

Mr. P. J. Payeur, had ordered a new coupling made by a blacksmith at Litchfield, Illinois. This new coupling had been in use several days before the accident. The State employees had worked on the road at this location for several weeks prior to the accident and knew that there were several long steep hills which the State truck would have to descend and ascend on each trip in bringing water for the mud jack operations. The brakes on the Ford truck were in good shape.

The most surprising and mystifying fact is that when about two-thirds down the hill the trailer became detached and that after the accident had happened, the rear of the State truck was examined and there was the iron pin in its place through the clevis attached to the Ford highway truck. Therefore, no one knows what happened to disconnect the trailer from the truck. One can guess or surmise that the coupling was jolted loose in coming down the hill and after the trailer was detached the iron pin was jolted back into place again.

Counsel for the claimant has stressed the point that this peculiar accident could not have happened if the coupling had contained a cotter pin or some safety device to keep the trailer from becoming detached.

It is therefore, contended that the State employees were negligent in not having the safety device installed when the new coupling was made a few days before this accident occurred.

This court considered that it is so well settled by the courts of Illinois and it has been announced so repeatedly by this court that it is not here again necessary to set forth the many cases which state "that the doctrine of *respondeat superior* does not apply to the State, counties, townships, etc." and the State is not liable for the misfeasance, wrongs, or negligence of its employees, agents or servants. Therefore, this case cannot be considered from the viewpoint of any legal liability on the part of the State of Illinois. In this case, this well established rule would apply. The only question, therefore, to be considered is the one of equity and good conscience, which has here been urged by the counsel for the claimant. The rule in this regard followed by this court is clearly set forth in the cases of *Theodore Stoddard,* et al, No. 1066, 1067 and 1068, Court of Claims Reports, Vol 6, pages 20 and 30.

It has been held by this court that the State should pay claims for damages when the claims are based upon an equitable right. To so base the claims, it has also been repeatedly held that the act of the State's agents must have been grossly careless or wantonly negligent. The question as to whether the above elements were present is very close. Testimony has been offered to show that there was present the fact of apparent gross carelessness or wanton negligence. Testimony has been offered by witnesses for the claimant that the coupling or clevis made without a cotter pin or other safety device was unsafe and that the State's agents in so making the coupling were grossly careless or wantonly negligent in the exercise of their duties. It is true that the State's agent used his best judgment to make the coupling right when he had the iron pin made longer. Evidently it was his judgment that this was sufficient protection. However, he failed to protect life by having a coupling constructed or made which would comply with the ordinary and usual custom. Because he failed to see that a cotter pin was necessary, as was proven by this terrible accident resulting in the death of three boys, was, in our opinion, gross negligence, and, according to his experience, he should have had the coupling made safe.

The evidence before this court shows that immediately after this accident the State Highway Department ordered all couplings in the future to be safeguarded with a cotter pin or other safety device.

There is no doubt the driver of the truck used his best judgment and did the thing he thought would save the boys. We cannot consider him grossly or wantonly negligent. When a person tries to do the right thing to avoid an accident but the facts afterward show that he was mistaken in his decision or judgment he cannot be considered grossly careless or wantonly negligent.

We have very carefully studied the evidence and cases submitted and have come to the conclusion that the statement and recommendation made by the Attorney General is correct. He says that in these cases:

"A full review of the evidence would indicate the presence of the three conditions that would justify an exception to the rule of liability on the part of the State for the acts of its agents, viz.—the existence of that degree of negligence on the part of the agents of the State which can be considered culpable, the absence of contributory negligence in any degree on the part of

the persons injured and in this case killed, there being in the light of all the evidence no reasonable opportunity for them to have avoided the consequences of the collision, and the further proof of serious injury (in this event death ensuing), and on the whole the equity and justice involved and entitled to consideration has led me to the conclusion and judgment that an award should be made in each of these cases.

In view of the above conclusions, without hesitancy, I respectfully recommend to the Court that an award in Claim No. 1801 of $2,500, in Claim No. 1802 of $2,750 and in Claim No. 1803 of $3,500, would not be excessive and would, in my opinion, under all the circumstances be just, equitable and a fair discharge of the moral obligation of the State."

Therefore, upon the recommendation of the Attorney General this court has come to the conclusion that under the rule of equity and good conscience these claims should be allowed. However, we also believe that when an exception is so made that the compensation should be adequate only to and commensurate with humanitarian needs to recompense the claimant for funeral and other necessary expenses caused by the accident. As we have said in other cases this court wishes to be fair to the claimant and consider these cases from a reasonable and equitable viewpoint. However, it must also be mindful that the funds of the State must be safeguarded and the interests and rights of all the People of the State preserved.

The Court of Claims not only has the right to determine whether the claimants shall have compensation but also it has the right to determine the amount of compensation which should be allowed. We believe, therefore, after a consideration of all the facts and circumstances, that these cases come under the rule of equity and good conscience.

In view of the above conclusions we award, in Claim No. 1801, $2,500.00 and in Claim No. 1802, $2,750.00, in full settlement of all claims arising from this accident and recommend that the same be paid.